[Civ. No. 3146.  Third Appellate District.—December 27, 1926.]

FRANCISCO & ELLINGTON, INC. (a Corporation), Re-
spondent, v. PASADENA TOURNAMENT OF ROSES
ASSOCIATION (a Corporation), Appellant.

[1] CONTRACTS—MUTUALITY—EXCAVATING WORK—RESERVATIONS—OP-
TION.—Although a contract for excavating work bound the con-
tractor to complete the contemplated work, while the other party
reserved the right to terminate it at any time and for any un-
foreseen reason, the contract was not void for want of mutuality
after the contractor completed the work and the stipulated pay-
ments therefor had been made, except the last, which was in

dispute, and the other party made no attempt to exercise the option to terminate the agreement.

[2] Id. — Deviation from Plans and Specifications — Quantum Meruit—Evidence—Findings.—In an action to recover a balance alleged to be due on a contract for excavating on the ground that the original plans and specifications had been deviated from, the evidence was sufficient to support the implied finding that there was no change in the plans and specifications by a subsequent agreement of the parties to the prejudice of plaintiff or which released plaintiff from its agreement to complete the work as originally agreed; and said agreement being the measure of plaintiff's right of recovery, it was not prejudiced by the refusal of the trial court to admit proof of the reasonable value of the services performed.

(1) 4 C. J., p. 883, n. 33; 13 C. J., p. 334, n. 43, p. 335, n. 46, p. 338, n. 69.  (2) 4 C. J., p. 1005, n. 68; 9 C. J., p. 886, n. 90; 40 Cyc., p. 2849, n. 24.

APPEAL from a judgment of the Superior Court of Los Angeles County. Paul Burks, Judge. Affirmed.

The facts are stated in the opinion of the court.

Shaw & McDaniel for Appellant.

Hahn, Hahn & Landreth, and Harold B. Landreth for Respondent.

FINCH, P. J.—Plaintiff was given judgment for the sum of $834.90 as the balance due upon a contract for making certain excavations in the construction of a stadium for defendant and has appealed therefrom, contending that a much larger balance is due. Appellant's principal contention is that the findings are not supported by the evidence in that no "binding contract between the parties" was proved and that, even assuming that there was a binding contract, "yet the plans of construction were so materially deviated from . . . on matters not contemplated within the terms of the contract that appellant is entitled to recover upon a *quantum meruit*." It is conceded that the judgment is for the correct amount if the contract which the defendant attempted to prove is the measure of plaintiff's right of recovery. Since the findings of the trial court from

conflicting evidence are conclusive on appeal, the evidence will be stated in the light most favorable to the support of the judgment, omitting contradictory evidence. Plaintiff was paid for certain extra work which was not within the terms of the agreement upon which the defendant relies. Compensation for such extra work is not involved in this action.

About February 15, 1922, the defendant undertook the construction of a stadium in the shape of a horseshoe with the open end to the south, the surrounding embankment to be raised approximately 50 feet above the finished floor level with earth taken from within the inner line of the embankment, the floor to be about 250 feet wide by 850 feet long. W. A. Taylor was the authorized representative of the defendant and Myron Hunt was the architect of the structure. W. T. Ellington represented the plaintiff in most of the transactions between the parties, he and Herbert Francisco then being copartners, but subsequently forming the plaintiff corporation. He offered, in behalf of the copartnership, to do the contemplated excavating at 30 cents a cubic yard and Taylor agreed to that price, but stated that he "wanted him (Ellington) to make an accurate figure and submit a lump sum bid." Ellington "said he had not figured it accurately enough," that "it would require somewhere from two to three weeks for him to do it, and he didn't have time to do it right then." No "lump sum bid" was ever submitted, but it was agreed that plaintiff would "move on the job and go to it," and work was commenced about February 20th with a small force. Plaintiff had a large force at work by March 20th and continuously thereafter until the excavations were completed. After the work was commenced Taylor received such instructions from defendant as to prevent the execution of a "lump sum" contract with plaintiff. It does not appear that either party thereafter expressed a desire to enter into such a contract, and it is a fair inference that the original understanding in that respect was abandoned by mutual consent. April 3, 1922, Taylor presented to Ellington for signature a proposed written contract, binding the plaintiff to "do all the excavation necessary in the construction of said stadium" for 30 cents per cubic yard, the yardage to be computed from the map of the premises provided by the architect "and the

finished grades as shown in the plans furnished by the architect." The last clause of the proposed contract was as follows: "It is further agreed that first parties may terminate this agreement upon three days notice to second parties by paying to them all money owed them to date, and in addition thereto the actual cost of removing their equipment from the premises." Ellington refused to sign the contract, objecting particularly to the clause providing for its termination. "It was agreed by both parties that . . . the rest of the document was substantially all right." Both parties then agreed that in the event of a termination of the contract, the amount to be paid to plaintiff would be left to the decision of Hunt. Hunt delivered to each party a letter accepting the proposal that he act as arbitrator between them, attaching thereto a copy of the proposed contract. The parties, however, never signed the contract, but the plaintiff continued the work. The plans were changed in certain particulars after plaintiff had first offered to do the excavating at 30 cents a yard. Among other changes, the tunnels were lengthened and the floor level was lowered two feet. The plaintiff made claim for extra compensation on account of the changes in the plans and on the 5th of July the parties met together in an effort to agree upon the amount of such extra compensation to which plaintiff was entitled. The conference resulted in the execution of the following document by the parties whose signatures are attached thereto:

"To W. A. Taylor and Rea P. Taylor: Copy to—M. J. J. Mitchell, President Tournament of Roses Assn.

"Mr. W. F. Creller, Chairman Building Committee.

"Francisco and Ellington, Architects' Superintendent.

"Referring to our memorandum A. 4216, Contract B. 3801, dated June 26th, 1922, regarding your settlement of extra items under your contract with Francisco and Ellington.

"After consultations with the Building Committee by both yourself and this office, we, in that memorandum, approved your allowing Francisco and Ellington a total added charge for various items as therein set forth, amounting to $9,000.00.

"The bill which they put in totaled something over $14,000.00. Other items in the bill were not allowed. After a further consultation today they convinced you and con-

vinced me that there was a proper charge coming from them as the result of the change back to the original level of the bottom of the Bowl, from a level 2' higher, which latter level was contemplated at the time you made your agreement with them.

"You are authorized to make a settlement with them in full for all items not covered by the flat agreement to move dirt at 30¢ per yard, providing they will accept, as they have agreed to accept, an additional $3,000.00, bringing their total bill exclusive of the 30¢ figuring, up to $12,000.00.

"Our contract A 4210, dated June 22, 1922, authorized you to pay Francisco and Ellington the sum of $6,000.00 on account of extra charges as definitely set forth in this memorandum. You are hereby authorized to pay Francisco and Ellington the further sum of . . . $8,000.00 which, together with the $8,000.00 payment referred to above, brings the total payments on account of extra charges to $12,000.00 as set forth above.

"As stated to you in our Order of July 6th, being Memorandum A 4233, Contract B 3801, it is left to you to determine the rapidity with which you can afford to pay out these moneys and still protect yourself in the matter of the cash bond which you have put up with the Owner.

"It should be definitely understood and agreed between you and Francisco and Ellington, that the acceptance of this additional $12,000.00 binds Francisco and Ellington to the completion of all excavating as required or directed in connection with the Stadium, under their unit price of 30¢ per cubic yard, plus only the additional, $12,000.00 authorized by this memorandum.

"Myron Hunt, Architect,

"By Myron Hunt.

"K. & O. E. July 6, 1922.

"Approved:

"Pasadena Tournament of Roses Building Committee,

"By W. F. Creller.

"Approved and accepted:

"Francisco and Ellington,

"By H. Francisco."

Relative to what took place at this conference, Hunt testified: "I did my utmost to make it plain . . . that we were making an effort to clean up the entire situation, and coming to one agreement as of this date that would settle all questions of cost and that this agreement contemplated settling for work already completed and certain work partly started and yet to be completed. . . . Q. Were Francisco and Ellington both there? A. Yes. . . . The agreement was that the dirt was thereafter to be placed where directed. . . . The entire settlement was accepted, and that was a part of the settlement. . . . Q. After this settlement of $12,000 . . . July 5, 1922, do you know whether any changes had been made in the plant . . . which caused a change in the grading? . . . A. It is just possible that pulling in 14 feet at the south end was done after that. . . . August 14th is the date of a drawing that shortened the field 14 feet and widened it 30 feet at the end. . . . It put the center of gravity of the remaining soil to be moved slightly nearer the point where it had to be dumped, perhaps a foot, . . . a very slight advantage to the contractor." Prior to the meeting of July 5th it had been determined that the earth to be excavated would be insufficient to raise the embankment to the height planned at all points, and it was decided to leave the south ends thereof unfinished and to use the yardage thus saved in completing the remainder. The change naturally resulted in a longer average haul. This shortage of earth for the embankment was due to the lengthening of the tunnels. Hunt testified that the additional expense of the longer haul was discussed and taken into consideration in fixing the amount of extra compensation which was agreed upon at the conference. W. A. Taylor testified that he first discovered that there would be a shortage of earth in May; that he did not know whether he informed plaintiff of that fact, "but I suppose that I did because that was in the general discussion at the time of this adjustment of July 5th, and it was what I understood all the time they were charging for and what they got paid for was the lengthened haul occasioned by the widening of the tunnels and placing the fill in a different position from . . . what the plan originally showed"; that at that conference Francisco and Ellington said that if the defendant would pay $12,000 for the extra work they "would

finish . . . the excavating of the stadium, as directed, place the dirt . . . as directed'' at 30 cents a cubic yard, and that no material changes were made in the plans thereafter ''excepting that the south end of the cut was shortened and widened, approximately balancing the excavation. . . . It made a very little shorter haul.'' W. F. Creller testified that the July settlement was made with the understanding that ''this would be all the extras there would be in connection with the completion of the stadium.'' Ralph Taylor testified that he knew on May 10th that there would be a shortage of earth and so informed Ellington a few days later and that Ellington replied that ''he knew there would be a shortage and had known it all along''; that ''it was made very plain to them (at the conference) . . . that the balance of the excavating must be done at a cost of 30 cents per yard without additional extras, to which Francisco and Ellington agreed. . . . The south end of the excavation was (thereafter) moved in some 14 feet and the width at the southerly end increased by some 28 feet. . . . Q. Do you know whether or not that change produced more earth to be excavated than if the plans had not been changed? A. There was no change made in quantity. . . . The only difference was this, that the haul was shortened slightly.'' July 15th, August 1st, August 16th, and September 1st, respectively, the plaintiff presented itemized bills for work done during the preceding semi-monthly periods, computing the yardage at 30 cents, and received payment therefor. No claim was made for the extra compensation here sought to be recovered until after the work was completed.

[1] Appellant contends that the agreement of April 3d was void for want of mutuality in that it purported to bind the plaintiff to complete the contemplated work ''but that respondent still reserved the right to terminate the work at any time and for any unforeseen reason.'' If the question had arisen prior to performance there would be much force in appellant's argument, but the contract has been executed by both parties. The plaintiff has completed the work and the defendant has made all stipulated payments therefor, except the last, which is in dispute because the plaintiff demanded a larger sum than provided by the contract, and the defendant has made no attempt to exercise its option to terminate the agreement. ''Even contracts uni-

lateral at first are sustained upon execution of the optional condition." (*Marin Water etc. Co.* v. *Town of Sausalito,* 168 Cal. 587, 600 [143 Pac. 767, 773] ; *North Confidence etc. Co.* v. *Morrice,* 56 Cal. App. 145, 149 [204 Pac. 851].)

Appellant contends that if it be held that the agreement of April 3d is valid, "even then the plaintiff is entitled to recover upon *quantum meruit* because of the changes made in the plans and specifications after the contract was entered into." The contract of April 3d was supplemented by the agreement of July 5th, and appellant does not contend that any changes made prior to the latter date are material to the question under discussion. In appellant's reply brief it is said: "Appellant contends the evidence shows that two changes were made about August 1st. (1) The south end of the field was shortened fourteen feet and widened thirty feet. (2) The south ends of the embankment were shortened approximately three hundred feet." The evidence hereinbefore quoted shows that the first change mentioned was to the advantage of the plaintiff. In addition to the testimony already set forth, Rea P. Taylor, testified that at the July conference "it was stated that this increase in length of the tunnels had caused the increase in the yardage of the fill and that would necessitate putting more of the dirt in the wide part of the fill, leaving the toes of the fill to be filled in at a later date, from material excavated from the river channel that was then contemplated. . . . There was not enough fill called for in the original plan opposite the south end to take the dirt that was excavated from it; that was just a very small section of fill in there. Q. I know, but there was some bank to be filled there according to the plans? A. Comparatively small. Q. As it was finished, the lower ends of the horseshoe were practically not filled at all? A. Quite right. And at the meeting that this settlement was made, Mr. Hunt then had said that if we did not have sufficient earth to complete absolutely all that was shown in the drawings in the way of a fill, that the earth would be available to place on the south ends of the horseshoe . . . where there was no seats to go, that earth would be available from the wash they were to cut in there with their steam shovel. Q. That was to be filled in from the river channel which is outside of the stadium? A. What it lacked was to be filled in from the river channel.

Q. Was it understood that plaintiffs were to do that? A. No sir, had nothing to do with that. Q. You say that was the conversation at the meeting in July? A. No, said if there was any material lacking we would leave it at the south end where the fill had no seats on it and it could be placed in at a later date and the probabilities were material would be available from the channel to be dug up at a later date. Q. Was there anything said then that the earth should be moved by them from the south end of the excavation up on the bank . . . north of the embankment and not opposite the place of excavation? . . . A. I don't remember of anything being said to the effect that the dirt would have to be placed not opposite of where it was excavated.'' It appears from the foregoing testimony that, while it was not specifically stated at the July conference that the plaintiff would be required to move earth from the south end of the excavation to parts of the embankment lying farther north, the parties must have understood from what was said that it would be necessary to do so. The fills at the south ends of the embankment were ''comparatively small,'' according to the original plans, ''not enough . . . to take the dirt that was excavated'' from the south end of the field, and it follows that the surplus thereof was to be deposited at other points in the embankment. The statements that it was necessary to place more earth in the wide part of the fill, ''leaving the toes of the fill to be filled in at a later date'' and that ''if there was any material lacking we could leave it at the south end where the fill had no seats on it,'' justify the inference that the parties understood at the July conference that the south ends of the embankment were to be left unfinished and consequently that the earth from the south end of the excavation was to be placed in the embankment at points other than those opposite the place from which it was taken.

[2] The complaint consists of a general allegation of indebtedness for services performed. The answer and the findings are equally general. The foregoing evidence is amply sufficient to support the implied finding that there was no change in the plans and specifications after July 5th to the prejudice of the plaintiff or which released it from its agreement of that date binding it ''to the completion of all excavating as required or directed in connection with the

stadium, under their unit price of 30¢ per cubic yard, plus only the additional $12,000 authorized by this memorandum.'' Since the agreement is the measure of plaintiff's right of recovery, it was not prejudiced by the court's refusal to admit proof of the reasonable value of the services performed.

The judgment is affirmed.

Thompson, J., *pro tem.,* and Plummer, J., concurred.